EDMUND MARKER, Claimant and Appellant *v.* DAN ZEILER, and JOE ZEILER, a Partnership, Employer, and AMERICAN CASUALTY COMPANY, Defendants and Respondents.

No. 10131.

Submitted September 19, 1961. Decided November 24, 1961.
Rehearing denied January 9, 1962.
367 P.2d 311.

Sandall, Moses & Cavan, Charles F. Moses, argued orally, Billings, for appellant.

Coleman, Lamey & Crowley, Bruce R. Toole, argued orally, Billings, for respondents.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

This is an appeal from a judgment of the district court, which judgment affirmed an order of the Industrial Accident Board which denied the claim for compensation of Edmund Marker.

The claimant Edmund Marker, appellant herein, was injured on the 25th day of June, 1957, while working as a carpenter in building and constructing a new residence for Dan Zeiler in his individual capacity. Dan Zeiler was also a partner with Joe Zeiler doing business as the Hardin Meat Market. The partnership is the respondent here. The partnership was enrolled under Plan 2 of the Workmen's Compensation Act on April 30, 1957.

Although the accident occurred on June 25, 1957, the employer's report by the partnership was received by the Industrial Accident Board on June 12, 1958, or nearly a year after the accident. The attending physician's report was received by the Board on June 23, 1958, lacking just two days of one full year of the date of the accident.

The Board heard the testimony and made certain findings of fact which are affirmed by the district court on appeal. Among the findings were the following:

"That the evidence showed the claimant's injury occurred while employed in the construction of a private residence for Dan Zeiler, an individual.

"That the evidence did not show that claimant was injured in an accident arising out of and in the course of his employment by Dan Zeiler and Joe Zeiler, a partnership."

The appellant, claimant, attempted to show that he was employed by the partnership, that the partnership was a covered employer under R.C.M.1947, § 92-614, and thus he was entitled to be paid benefits for the injury.

The respondent partnership and the insurer contended that the claimant was not in the employ of the partnership at the time of the injury and accordingly was not entitled to benefits.

In other words, the question of fact to be determined by the Board and reviewed by the district court, (it being conceded that claimant was injured while working on a residence for Dan Zeiler) was whether he was working for an employer covered by the Workmen's Compensation Act (the partnership)

or whether he was working for an individual (Dan Zeiler) not covered under the provisions of the Act.

The specifications of error go to the findings of fact previously set forth.

Appellant's brief is predicated on the view that he was employed by the partnership and was injured while doing work as directed by one of the partners; and that the question of whether the work that he was doing at the precise time of his injury was for one of the partners individually or for the partnership is immaterial. But, we observe that before any consideration can be given the problem discussed and argued by appellant the basic premise of employment must be met.

The testimony is revealing at this point. The appellant testified in part as follows:

"Q. What was the first job that you did when you got to Hardin for the Zeilers, or either of them? A. The first?

"Q. Yes. A. I done some work in his house.

"Q. Now is that the house where you had your accident? A. No.

"Q. What house was that? A. Well, the house he was living in.

"Q. And what kind of work was that? A. I framed in a bathroom in the basement, closed up a bathroom in the basement.

"Q. Following that job then, did you go to work on the house that he was building for himself? A. Yes.

"Q. Did you work steadily on that house until the time of your accident? A. No.

"Q. What else did you do in between times in the way of employment? A. Worked on this trapdoor.

"Q. That was a 3-hour job? A. Yes.

"Q. Those three hours were all spent at one time until the job was finished? A. Yes.

"Q. Aside from the 3-hour trapdoor job, however, you

worked steadily on Dan Zeiler's home? A. Except for the weather.

"Q. I am referring to jobs now, not particular hours. You went to work on the house about when? A. On which house?

"Q. I am referring now to the, now, to the new house that Dan Zeiler—A. First week in May—I am not sure.

"Q. And your accident was—A. On the 25th of June.

"Q. So that you worked for nearly two months rather steadily on Mr. Dan Zeiler's house, is that correct? A. Yes.

"Q. And your only other employment during that nearly two months of time was the three hours spent over at the meat market fixing a trapdoor? A. Yes.

"Q. Who actually handed you your paychecks? A. Mr. Zeiler.

"Q. Meaning Dan Zeiler? A. Dan Zeiler, yes.

"Q. I believe you stated that you thought you read the checks with which you were paid as being drawn on the Security Trust & Savings Bank in Billings, and on the Billings State Bank in Billings, to the best of your recollection? A. To the best of my knowledge, yes.

"Q. Now you have testified to some extent, Mr. Marker, respecting the activities of the partnership. You are fairly certain in your own mind that they ran the meat market as a partnership, and that they ran a slaughtering business as a partnership, and that they ran a—did you say a feedlot or a farm as a partnership? A. Yes.

"Q. Now isn't it true that those things that I have mentioned earlier are the principal things that these men appeared to be engaged in as a business, I mean that was their regular day in day out method of making a living so far as you were able to observe? A. Yes, as far as I observed, yes.

"Q. When these other gentlemen came down from the meat market, I think Mr. Kopp and Mr. Yerger, they were there for a short time were they not? A. They was there on several different occasions, at different times.

"Q. What would they do when they came out? Yard work around? A. Yard work.

"Q. I mean, cleaning up around the place or what? A. No, they didn't clean up that I know of. They had a little trouble with a cave-in and had to get the dirt out, at the time of the cave-in into the basement.

"Q. Was that at that time when you needed a little extra help to do the job properly? A. Yes.

"Q. And that was the principal extent of their work, Kopp and Yerger? A. (No reply).

"Q. Do you remember anything else specifically they did around the place? A. They might have, I heard them talk about they had done some work during the weekend when I wasn't there.

"Q. But you don't know what that was? A. I don't know what that was."

On direct examination, Dan Zeiler testified in part as follows:

"Q. Now, in the buying of materials for the residence, did you purchase those materials yourself? A. Yes, I bought them myself, but we compared prices and he was pretty well acquainted around Billings, here, and we compared prices here and there, and on several occasions we picked up lumber in Billings instead of Hardin.

"Q. He was of great assistance to you in that respect? A. Yes.

"Q. How did you pay for these materials, from the market account or from your own personal account, or from what account, if you recall? A. Personal account, sir.

"Q. All of them? A. All, some of it was cash when I had a little lucky streak.

"Q. But when you refer to 'lucky streak,' it is something disconnected with the partnership, is that right? A. Yes, sir.

"Q. Now the payment to Mr. Marker for his work, that is,

his wages, from what account was that paid? A. Personal account.

"Q. He has mentioned two banks? A. There was three, sir.

"Q. What accounts were those? A. Well, Security, Billings State, and Big Horn County State.

"Q. Were those any special accounts or were they all your personal accounts? A. Personal.

"Q. All three? A. Yes sir."

Considerable effort is made by appellant to show that in fact this dwelling, upon which the appellant was working at the time of his injury, had some connection with the partnership. The inference is made that it was paid for with partnership funds. To the extent that the principal source of livelihood of Dan Zeiler is the partnership, partnership funds were used to build the home. However, this represented nothing but his personal income from the partnership, plus repayment of a loan previously made to his partner. To put this particular contention in proper perspective, we quote from the cross-examination of Mr. Dan Zeiler as follows:

"Q. Mr. Zeiler, as I gather from your testimony, your regular business upon which you regularly make your money that you live on consists of running a meat market in partnership with Joe, running a slaughter business and a food locker business, buying cattle and feeding them and slaughtering them, mostly for your own market, selling the excess and raising feed on a farm, most of which is used in your own feed lot. Does that sum up the principal business of the partnership? A. That is right, sir.

"Q. Is there anything else—I am not just talking about a casual or infrequent business transaction, but is there anything else that forms a part of the partnership business as a regular thing? A. Yes sir.

"Q. What is it? A. We do custom baling.

"Q. Custom baling? A. Yes.

50

"Q. That is hay baling? A. Yes, yes sir, hay and straw also.

"Q. Were you doing that at the time of this accident? A. I don't remember for sure. I don't think the first cutting was quite ready yet, but we was prepared to do it, yes sir, because we—had the baler and also did, we sold some of the hay because we had more than we needed, and that was a partnership deal also.

"Q. Now does that include all of your regular partnership business, I am talking about your established regular business? A. Well, I have to think about this a little bit here, it is kind of a buy and sell feed and stuff.

"Q. All right. Occasionally do you find some deal that is out of the ordinary that you will pick up to try to make some extra money on? A. That is right.

"Q. For instance, did you recently buy and sell some wool? A. That is right.

"Q. That, however, I judge is not the usual thing—in your snooping around and see a deal of some kind, you will take it? A. That is right, sir.

"Q. Those things, are handled by the partnership, not by you alone? A. Well, I generally do the transacting of it, but it is a partnership deal.

"Q. Do you use the partnership bank account to finance these deals? A. Yes, sir.

"Q. In all, does all of the partnership financing go through your partnership bank account? I mean if you buy and sell anything for the partnership, does it go through your partnership bank account? A. Yes sir.

"Q. You do not then, I judge, as a partnership, build houses for partnership income? A. Not for income—we have built each other a house, we never build for an income, just a place to live.

"Q. Some years ago did Joe Zeiler, your partner, build a house? A. Yes sir.

"Q.  When was that?  A.  I think it was about '54.

"Q.  Did you and Joe withdraw a sum of money from the partnership?  A.  Yes  sir.

"Q.  Which was applied on the cost of that house?  A.  Yes sir.

"Q.  How was that handled?  A.  It was withdrawn from the bank account, we each draw a check out of it.

"Q.  About how much, if you know?  A.  $1,500 several times apiece.

"Q.  You each withdraw an equal amount out?  A.  That is right sir.

"Q.  And then was all of the money that was drawn out, both yours and Joe's, applied on his house?  A.  Yes sir.

"Q.  Have you been paid back any of that money that you withdrew and turned over to Joe?  A.  Not yet sir.

"Q.  You didn't take any promissory note for it?  A.  No sir.

"Q.  Was it a gift to Joe?  A.  No, not hardly.

"Q.  You regard then that actually that represents money that sooner or later should be paid back to you?  A.  Yes sir.

"Q.  Now when you said a while ago that your expenses for building your house would be partly reimbursed by partnership funds, what plan did you have in mind?  A.  Well, I withdraw a check out of the banking account.

"Q.  Would that be the same kind of an arrangement that was put up when Joe built his house?  A.  Well, we figured it that way, yes sir, after we got well enough heeled again.

"Q.  That hasn't been done to date?  A.  No sir.

"Q.  Did you arrange for that system when Joe built his house, that is, an equal withdrawal of money because Joe was short of funds to proceed with his house?  A.  Well, at that time I hadn't figured on building one yet, see, but I knew I would get my money because I loaned him some before.

"Q.  You regarded it, in effect, as a loan?  A.  That is right.

"Q.  And a personal loan to Joe?  A.  Well, we just didn't

have the money, and, I mean he didn't have the money to finish his house.

"Q. That's what I am driving at, you loaned him the money or arranged for this money to be available because he didn't have the financing to go ahead with the house on his own? A. Yes sir.

"Q. Now, has it been your plan in order to recoup that money, to withdraw a sum, both you and Joe, from the partnership whenever it is well enough heeled to equalize the money that Joe has gotten out of the partnership? A. That is both of our plan.

"Q. That is the arrangement between you? A. Yes sir.

"Q. That is what you mean—I believe you said—the partnership would reimburse you for part of the expense of that house? A. Yes sir.

"Q. Why hasn't that been done to date? A. Didn't have enough money.

"Q. When the partnership finally does accumulate enough surplus, then you will put that plan into effect? A. Yes sir, we just bought that farm last year and we kind of run our resources a little short, but—

"Q. To make it perfectly clear, when you do accomplish this plan that you have in mind, both you and Joe will withdraw an equal amount of money from it, from the partnership and then that money will be turned over to you to be applied on your house expenses, is that right? A. Yes sir.

"Q. You are not planning to withdraw that money directly from the partnership in one check, but rather planning to take it out in two separate amounts—an amount for Joe and an amount for you, is that right? A. Yes sir.

"Q. Doesn't it amount simply to this: That when Joe was building his house, there was some money in the partnership, and you decided to make a distribution of partnership funds in an extra large amount so Joe would have money available to build his house? A. Well, I didn't need the money at that

time, and he needed it, so we went about it that way just to keep the partnership equal.

"Q. You don't have any written papers? A. No sir.

"Q. In connection with that? A. No sir.

"Q. Do you claim any interest by reason of being a partner with Joe in Joe's house? A. No sir.

"Q. You have no claim to that house whatsoever? A. No sir.

"Q. Does Joe have any claim that you know of to your house by reason of any transactions that you have had? A. No sir.

"Q. Do you regard that house as your own? A. Well, I have got a wife and several children.

"Q. It is on your own ground, isn't it? A. Yes sir.

"Q. Does the lot, does the partnership have any interest in the lot upon which the house sits? A. No sir.

"Q. Did you pay for that lot yourself? A. Yes sir.

"Q. Out of your own personal funds? A. Yes sir."

On the general employment relationship, Mr. Dan Zeiler testified on cross-examination as follows:

"Q. Now, respecting commands that might be given to Mr. Marker regarding his general employment, you made the statement that if Joe had wanted him, you thought undoubtedly some arrangement could be made for Joe to use him? A. Yes sir.

"Q. And I think in that connection, you said that he would obey Joe's commands as well as your own, is that right? A. Yes sir.

"Q. However, when he was working on your own house, did you expect him to follow your directions as distinguished from Joe's? A. Well, if he had needed help, I would let him have it, but it was only a short period.

"Q. You didn't expect Joe to go down and tell Mr. Marker how to build your house? A. No sir.

"Q. When he was working on your house, he was your employee? A. Yes sir.

"Q. Was the arrangement with Mr. Marker something like this: You went to talk to him, there was some jobs to be done, your house and so, and then some partnership business—that is, the slaughter house and I think what was the feed lot? A. Yes sir.

"Q. And was that arrangement something like this: That you would keep Mr. Marker busy, give him a job until such time as the partnership affairs were ready to proceed? A. We planned it that way.

"Q. Well, he planned to be working on your house and be your employee until such time as you were ready on those other jobs? A. Yes sir."

Incorporated in the record is the payroll of the partnership, Hardin Meat Company, showing each check paid by the partnership from May 1, 1957, to July 9, 1957, and these exhibits further disclose that where the check was paid for employment by an employee of the partnership, there was State and Federal Withholding Tax, Social Security, and the net wages reflected in the exhibit. It is significant that during this entire period the appellant's name does not appear on the books of the partnership.

From the foregoing quotations, and taking all of the testimony and exhibits together, the following facts are apparent:

1. The partnership made no claim of interest in the Dan Zeiler house.

2. Other than a few small items, identified in Exhibit No. 1 presented at the trial before the district court, the materials that went into the house were paid for by Dan Zeiler.

3. The claimant's wages were paid by Dan Zeiler individually, and not by the partnership.

4. The claimant took his orders in the construction of the house from Dan Zeiler. The other partner, Joe Zeiler, had no say whatsoever in the construction of the house.

5. The house was erected on property belonging to Dan Zeiler individually.

6. The partnership did not make any withholding for income tax purposes on the wages of claimant. He was not carried under Social Security rolls. During the entire period of time in question, he received no wages from the partnership.

7. The employer's report was not made until almost one year after the accident.

8. Doctor's report was not made until one year after the accident.

9. The relationship of brother-in-law existed between the claimant and Dan Zeiler.

From the foregoing testimony and fact summary it can be seen that there was substantial evidence, uncontradicted for the most part, that at the time of the injury the claimant was in the employ of Dan Zeiler as an individual and was not in the employ of the partnership.

The dissenting opinion of Mr. Justice John C. Harrison ignores the fundamental, long-established rule of this court that if there be substantial evidence to support the findings of fact (here both the Industrial Accident Board and the District Court) this court will not reverse on appeal.

The dissenting opinion fails to mention or contemplate the positive testimony that proves the hiring and work were for the individual, Dan Zeiler, in the first instance. As a consequence of this fact, the status of employer-employee never existed between the Hardin Meat Company and the claimant.

It should be further noted in the dissent that comment is made on the fact that other employees were compensated out of partnership funds. This statement attains the apex of truthful fact, and they were so paid as they were *partnership employees,* as is reflected in the record.

This was and is one of the basic reasons that disprove the contention of the claimant.

Under our oft-repeated holding that we will not reverse the finder of fact unless the evidence clearly preponderates against it, we must affirm the district court. See Maroney

v. Dyll, 137 Mont. 187, 351 P.2d 373; Sands (Sands Lbr. Co.) v. Superior Building Co., 136 Mont. 531, 349 P.2d 314. It follows that the judgment should be and is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE CASTLES concur.

MR. JUSTICE ADAIR:

I dissent to the foregoing majority opinion.

MR. JUSTICE JOHN C. HARRISON:

I dissent.

R.C.M.1947, § 92-838, provides that ''Whenever this act or any part or section thereof is interpreted by a court, it shall be liberally construed by such court.''

This court has consistently held that it means ''liberally construed'' in favor of the claimant. See McCoy v. Mike Horse Mining & Milling Co., 126 Mont. 435, 440, 252 P.2d 1036; Tabor v. Industrial Acc. Fund, 126 Mont. 240, 242, 247 P.2d 472; Gaffney v. Ind. Acc. Bd., 129 Mont. 394, 400, 287 P.2d 256; Grief v. Ind. Acc. Fund, 108.Mont. 519, 93 P.2d 961.

There was testimony to indicate the appellant was hired to do *any* work that was required for the partnership, and that the partnership work had priority over work on the residence. The various jobs done by the appellant, including work being performed at the time of the appellant's injury, were consistent with this understanding.

There are a number of factors which support a finding that the employer-employee relationship existed between the partnership and the appellant, and which show that the partners looked upon the construction of Dan Zeiler's house as being closely related to the partnership business and to the advantage and benefit of the partnership. These factors are as follows: In addition to the appellant, other persons were employed by the partnership and worked on the construction of the house. The

testimony shows that tools and equipment of the partnership were used in building the house. There was evidence that Joe Zeiler, the other partner, approved and ratified these other employees working on the residence, at least he did not at the time of the industrial accident herein nor the time of the trial appear to contest this statement of his brother. These employees were paid out of partnership funds for their work. Other indications that this work was not considered by the partners as entirely foreign to the partnership activities was evidence that the partnership employees had been used at a prior time on the construction of the home of Joe Zeiler, the other brother.

There was also testimony to the effect that the financing of Dan Zeiler's house was through the partnership; that the partners looked upon the payment out of partnership funds of the cost of construction as a form of reimbursement to the partner. Dan Zeiler testified that the plans for his residence included office space to be used in the furtherance of the partnership business. There was also testimony indicating that the partners considered that it was in the interest of the partnership to furnish regular employment to the appellant in order to have him available for the later construction of the slaughter house and the feed lot.

There was testimony to show the partnership employees worked on the houses of Dan Zeiler and Joe Zeiler when there was no regular work to be done at the meat market. The testimony indicated that the partners considered it to be of a benefit to the partnership to maintain a regular working force by utilizing their employees fully, doing any work that was available and not having to lay any of them off during the slow periods.

Another factor indicating employer-employee relationship was the employer's first report of injury which was submitted to the Industrial Accident Board by Dan Zeiler and Joe Zeiler, doing business as the Hardin Meat Market.

In considering the acts of the alleged partner as indicating the relationship of an employer-employee relationship, see 99

C.J.S. Workmen's Compensation § 64, p. 278, wherein it is said: "* * * the fact that he reports an injury to the insurance company tends to indicate that he considered such relationship to exist between himself and the injured person." Ryder v. Johnson, 313 Mich. 702, 22 N.W.2d 43.

It is my opinion that the understanding of the party at the time of the appellant's employment, the subsequent actions of the parties, the integral relationship between the partnership activities and the work on Dan Zeiler's house support a finding that the relationship of employer and employee existed between the partnership and the appellant at the time of the appellant's injury, and that therefore the findings of the Industrial Accident Board and the district court were contrary to a preponderance of the evidence. The judgment should therefore have been reversed and the cause remanded to the district court with instructions to remand proceedings to the Industrial Accident Board for the allowance of compensation to the appellant, Edmund Marker.